**In re JARTRAN, INC., Debtor.**

**Bankruptcy No. 86 B 3691.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

March 31, 1987.

Gerald Munitz of Nachman, Munitz & Sweig, Ltd., Chicago, Ill., for Jartran, Inc.

Nancy Alquist of Winston & Strawn, Chicago, Ill., for Frank B. Hall.

Sara E. Cook of McKenna, Storer, Rowe, White & Farrug, Chicago, Ill., for Fruehauf Corp.

Donald R. Cassling of Jenner & Block, Chicago, Ill., for U-Haul Corp.

### AMENDED

### *Memorandum and Order*

JOHN D. SCHWARTZ, Bankruptcy Judge.

This matter comes before the Court on the motion of Fruehauf Corporation ("Fruehauf") for allowance of administrative claims, as more fully described below. The Debtor in this case has also filed a motion for summary judgment in its favor as respects the Fruehauf motion.[1] Fruehauf has responded with its own cross-motion for partial summary judgment or in the alternative, a motion to dismiss Jartran II pursuant to § 1112 of the Bankruptcy Code (11 U.S.C. § 101 *et seq.* (1986). All statutory references herein are to the Bankruptcy Code unless otherwise noted.)

The parties do not contest the salient facts. A summary of these facts together with a recapitulation of the history of the Jartran cases is necessary to an understanding of the Court's ruling.

### History

Jartran, Inc. was organized in 1978 and commenced operations in 1979. Jartran, Inc. was in the business of renting and leasing trucks and trailers on a nationwide basis through independent dealer agents ("Agents") in both the retail and commercial markets. In 1979, Fruehauf and Jartran, Inc. entered into two Master Leases dated March 21, 1979 and November 21, 1979, respectively. Pursuant to the terms of the Master Leases, Jartran, Inc. leased approximately 19,650 vehicles from Fruehauf for use by Jartran, Inc.'s Agents. By the end of December, 1981, Jartran, Inc. owed Fruehauf over $7,036,000 under the Master Leases. (Disclosure Statement of Jartran I, November 15, 1982, Section III, hereinafter called "Disclosure Statement".)

On December 31, 1981 Frank B. Hall & Co. ("Hall") acquired 92% of the common stock of Jartran, Inc. On that same day, Jartran, Inc. filed for relief under Chapter 11 of the Bankruptcy Code (81 B 16118). (Disclosure Statement, Part I § C and Part IV § B.)

Under Jartran I's Fifth Amended Plan of Reorganization as thrice modified ("Plan"), Fruehauf was treated as a Class 3 creditor. Fruehauf's and Jartran's obligations under the Plan were set forth in the "Obligation Restructuring Agreement" ("ORA") which was entered into on January 21, 1985, the effective date of the Plan. Under the ORA, the terms and obligations set forth in the Master Leases remained in full force and effect except those obligations dealing with the payment of monies due or to become due to Fruehauf. (Third Modification to the Plan, Exhibit F § II(c).)

The ORA provides for Fruehauf's claim of $54,700,000.09[2] to be discharged by

---

1. At the outset, it is necessary for the Court to identify the four stages of "Jartran" as it is referred to in this Memorandum and Order. Each Jartran is to some extent an entity with its own attributes. *See In re Chattanooga Wholesale Antiques, Inc.,* 67 B.R. 899, 901 (Bankr.E.D. Tenn.1986). "Jartran, Inc." shall refer to the debtor prior to the filing of the first petition in bankruptcy on December 31, 1981. "Jartran I" shall refer to Jartran as debtor in possession during the first bankruptcy case, covering the period from December 31, 1981 to the date Jartran I's Fifth Amended Plan of Reorganiza-

tion as thrice modified was confirmed, September 29, 1984, 44 B.R. 331, and which became effective, January 21, 1985. "Jartran" shall refer to the debtor as it existed after confirmation of the Plan and up until the filing of the instant case, March 4, 1986. References to "Jartran II" shall refer to the debtor in possession in this case.

2. This amount represented the total amount of Jartran, Inc.'s obligations under the Master Leases prior to the ORA.

monthly payments from Jartran to Fruehauf of $200,000 per month for 72 months, plus 2% of the rental revenue received by Jartran over a seven year period. Hall, as party to the ORA, also agreed to pay Fruehauf approximately $7,000,000 on the effective date of the Plan representing "advance lease payments".[3] (Third Modification to the Plan, December 5, 1983. Schedule B, Exhibit F. *See also* Exhibit D § 2.3(a)(1).)

Jartran I's Plan was confirmed on September 29, 1984. This Court has heretofore determined that Jartran I's Plan has been substantially consummated under the provisions of § 1101(2) for, among other reasons, distributions provided by the Plan had commenced. Jartran, subject to the terms of the Plan, operated its business from and after September 29, 1984 free of the Bankruptcy Code and of this Court's supervision.

On October 24, 1985, Jartran I entered into a compromise agreement with Fruehauf regarding Jartran's obligations to pay for vehicles lost, damaged, or destroyed prior to December 31, 1983. This agreement was approved by the Court on December 20, 1985. This Court retained jurisdiction under Article 16 of the Plan,

> [T]o require the performance of any act that is necessary for the consummation of the Plan including, without limitation, the jurisdiction to hear and determine all claims against Jartran [I] and to enforce all causes of action which may exist in its favor ... and to enter such orders regarding the disbursement of funds under the Plan or the consummation thereof as may be necessary to protect the interests of Jartran [I] and its creditors.

(Jartran II's Reply Memorandum raises the question of this Court's jurisdiction to convert Jartran I to a Chapter 7 case under § 1112(b). See P. 941 *infra*.)

On March 4, 1986, Jartran commenced a new case under the Bankruptcy Code, creating a new debtor in possession, Jartran II, the Debtor who is the subject of the proceedings now before the Court.

### Fruehauf's Motion

Fruehauf's motion for allowance of administrative priority encompasses three separate claims. The first claim is for the entire amount due under the Master Leases, as amended by the ORA (further references to the "Master Leases" will, unless otherwise noted, refer to the Master Leases as amended). The second claim arises out of the breach of the October 24, 1985 agreement respecting lost and damaged vehicles. The third claim is for costs of repossessing leased Fruehauf equipment subsequent to March 4, 1986. These three claims are discussed below.

The gravemen of Fruehauf's motion rests on its assertion that the Master Leases with Jartran, Inc. were assumed within the Jartran I proceedings by virtue of confirmation of the Plan. These Master Leases will be rejected within the Jartran II proceedings, a fact acknowledged by Jartran II. Fruehauf argues that it is entitled to an administrative priority under § 365 for the entire balance due it under the Master Leases, since they were assumed and will be rejected in the same case; the two Jartran cases being in effect the same case.

Alternatively, Fruehauf requests the Court find that Jartran I entered into a new contractual obligation by virtue of the ORA. Consequently, Fruehauf maintains it is entitled to priority under § 503(b)(1)(A) for the balance due under the Master Leases, since the leased equipment was necessary for preserving the estate of Jartran I, and the operations of Jartran after confirmation of the Plan. Again, no distinction has been made between the two Jartran cases.

Fruehauf also claims priority for the amount of $145,525.00 due under the October 24, 1985 agreement on the basis that this agreement was either (i) a further

---

**3.** Fruehauf, in its motion for administrative claims, characterized this $7,000,000 payment as "an amount which cured the pre-petition default of the debtor". It is not necessary in reaching a decision in the instant dispute to decide whether the $7,000,000 payment was made to cure Jartran Inc.'s pre-petition defaults, or whether it was for adequate assurances of future performance.

modification of the existing Master Leases, assumed and rejected in the same case, triggering priority under § 365, or (ii) a newly negotiated post-petition contract, triggering priority under § 503(b)(1)(A).

Finally, Fruehauf is seeking administrative priority for the cost of repossessing equipment covered by the Master Leases, which under the ORA, Jartran became obligated to recover in the event of default.

**Jartran II, U-Haul, and Hall's Responses**

Jartran II moved for a summary judgment with respect to all three of Fruehauf's claims. Jartran II argues that Fruehauf is not entitled to an administrative priority for any of its claims since (i) the Master Leases were assumed in the Jartran I proceedings and will be rejected in the Jartran II proceedings, a separate proceeding; (ii) the estate of Jartran II has received no benefit from Fruehauf's equipment, consequently recovery under § 503(b)(1)(A) is inappropriate; (iii) granting Fruehauf's reimbursement for Jartran II's failure to marshall equipment would result in preferential treatment of Fruehauf over other creditors of Jartran II; and (iv) Fruehauf's claim from Jartran II's breach of the October 24, 1985 agreement gives rise to only an unsecured claim.

U-Haul International Inc. ("U-Haul") and Hall also filed memoranda challenging Fruehauf's position. Each takes issue with Fruehauf's claim that it is entitled to administrative priority in a subsequent case for an obligation incurred in a prior case. Hall argues that § 365(g)(2)(A) only applies to converted cases and Jartran II is not a conversion of Jartran I, but is a separate case. U-Haul adds that Fruehauf is essentially acting in its own self interest by repossessing equipment which it has a security interest in, and therefore, should not receive priority for that claim.

**Fruehauf's Reply**

Fruehauf subsequently responded with a cross-motion for partial summary judgment arguing that it is entitled to an administrative priority as a matter of law, or in the alternative, asking the Court to dismiss Jartran II. Fruehauf argues that after this Court found that the Plan in Jartran had been substantially consummated, the commencement of an entirely new Chapter 11 case can not be used to effect a modification of an existing Plan. Rather, Fruehauf maintains that Jartran II should be dismissed and Jartran I should be converted to Chapter 7 pursuant to § 1112. Put another way, this Court's failure to convert would be an abuse of its discretion under § 1112 of the Bankruptcy Code.

**Jartran II's Reply**

Jartran II's reply addressed the propriety of filing successive Chapter 11 cases that are filed in good faith as well as the retained jurisdiction of the Court under the Jartran I Plan. Additionally, Jartran II points to the procedural defect of Fruehauf's motion to dismiss.[4]

**Discussion**

Contrary to Fruehauf's assertion, the Court does not consider Jartran II as a continuation of Jartran I, but considers the two as separate cases characterized by different objectives, assets and claims. The Court is not abusing its discretion by refusing to dismiss the Jartran II case and then converting the Jartran I case to one under Chapter 7 liquidation.

The objectives of Jartran I were to reorganize and continue Jartran, Inc.'s pre-petition nationwide trailer and truck rental business under restructured financial obligations. To this end, the Master Leases with Fruehauf were modified, and the financial obligations thereunder were restructured, as more fully described in the ORA and the Plan. Hall, the parent of Jartran, Inc., made an initial payment of $7,000,000 to Fruehauf pursuant to the terms of the ORA.[5]

Upon confirmation of the Plan, Jartran, Inc. was discharged of its pre-petition debts and in consideration thereof Jartran as-

**4.** Rule 2002(a)(5) requires that this Court hold a hearing, on 20 days notice, prior to determining whether or not to dismiss a pending bankruptcy proceeding or convert a case to Chapter 7 from Chapter 11. To date, Fruehauf has not requested such a hearing.

**5.** See fn. 3, *supra.*

sumed the obligations of Jartran Inc. and Jartran I as provided for in the Plan. (§ 1141(d)(1).) Jartran was revested with its property (§ 1141(b)) and commenced renting trucks and trailers through Agents on a nationwide basis, free of this Court's supervision.

Jartran II, on the other hand, is a new case with assets, liabilities, and objectives different than those of Jartran I. Jartran II is not an attempt to modify the terms of the Plan, but rather is a good faith admission that Jartran was unable to continue operating as a going concern. Jartran II and Hall have submitted a Joint Plan ("Joint Plan") which calls for selling the assets of Jartran II pursuant to § 1123(b)(4) and making distributions to holders of claims.[6] See R. Ginsberg, Bankruptcy ¶ 13,457 (1985). Jartran II does not intend to reorganize its business of nationwide truck and trailer rentals and therefore is not assuming or renegotiating any of the contracts or agreements that existed at the commencement of this case. Specifically, there is no intention on the part of Jartran II to modify any of the agreements with Fruehauf or any other of its creditors. No successor to the nationwide truck and trailer rental business will emerge through the Joint Plan. The result of a confirmation of the Joint Plan will not be a discharge of Jartran II from its pre-petition debts. Under § 1141(d)(3)(A) confirmation of a plan that provides for liquidating all, or substantially all, of an estate's property does not discharge the debtor of its pre-petition debts.

It is this aspect of Jartran II that distinguishes it from the two cases Fruehauf relies on for its contention that the instant case is a serial filing and an attempt to circumvent the prohibition against amending a Plan once it has been substantially consummated.

In *In re Northampton Corp.*, 39 B.R. 955 (Bankr.E.D.Pa.) *aff'd* 59 B.R. 963 (E.D. Pa.1984) the court refused to allow a successive Chapter 11 case where the debtor intended to file a second plan in order to cure defaults and modify obligations that had been previously modified in the first confirmed plan of reorganization. *Northampton*, 39 B.R. at 956. The court held that "[t]he filing of a Chapter 11 petition, with an eye toward curing defaults arising under a previously confirmed Chapter 11 plan, is so akin to modifying the previous plan within the meaning of § 1127(b)" that the second case could not be commenced and the case was converted. *Id. See also In re Northampton Corp.*, 37 B.R. 110, 113 (Bankr.E.D.Pa.1984).

Similarly, in *In re AT of Maine*, 56 B.R. 55 (Bankr.D.Me.1985) the court refused to allow the debtor to file a successive Chapter 11 plan where the debtor sought to sell assets in the second plan in order to cure arrearages and satisfy obligations of the first plan. *Id.* at 56.

In *AT of Maine* and *Northampton*, the debtors sought to use the automatic stay provisions to hold off their creditors while proposing a second plan which was intended to cure defaults arising from the inabilities of the debtors to meet the terms of their first plans. *AT of Maine* and *Northampton* unquestionably stand for the proposition that, following "substantial consummation", a plan may not be modified by the commencement of a new Chapter 11 case under the Bankruptcy Code. This Court agrees in substance with those two cases. However, that conclusion does not require that Jartran II be dismissed, or that every subsequent request for relief under the Bankruptcy Code by a reorganized entity must be dismissed and the prior case converted to a Chapter 7 liquidation.

---

**6.** Fruehauf mistakingly argues that since the instant case will liquidate the estate's assets, it should be treated as a Chapter 7 case. This argument ignores the fact a liquidation under Chapter 11 is often preferable when the liquidation can proceed in a more orderly, expeditious, and less expensive manner under the con-trol of the debtor. *Cf. In re L.S. Good & Co.*, 8 B.R. 315 (Bankr.N.D.W.Va.1980). Fruehauf and Jartran II are currently working together to marshall and liquidate the estate's assets in order to obtain the highest possible return while minimizing the costs.

The Court finds and determines as a matter of both fact and law that Jartran II is separate from Jartran I.[7]

■ Since this Court has found and determined that Jartran II is a separate and distinct case from Jartran I, Fruehauf's claim for priority treatment of its breach of contract claims under § 365(g)(2)(A) must fall. It is a fundamental principle in bankruptcy law that a debtor in possession (Jartran II) does not become a party to an executory contract unless such debtor assumes the contract in the manner provided by statute (§ 365). *In re Bildisco*, 682 F.2d 72, 78–79 (3rd Cir. 1982), *aff'd sub nom., NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984); *see generally*, R. Ginsberg, *Bankruptcy* ¶ 7101, 7201 (1985). Absent assumption of the Master Leases, Jartran II is not obligated to Fruehauf by way of a priority claim for rejection of the Master Leases. *See Bildisco*, 682 F.2d at 83. Claims resulting from rejecting pre-petition leases and contracts are treated as pre-petition claims. *In re Dant & Russell, Inc.*, 67 B.R. 360, 363 (D.Or.1986); 11 U.S.C. § 365(g)(1); R. Ginsberg, *Bankruptcy* ¶ 7203 (1985). Fruehauf can not circumvent this fundamental principle of the Bankruptcy Code to obtain a priority position in this case for its three claims.[8]

The Court must also address Fruehauf's motion to dismiss the instant case and convert the prior case to a Chapter 7 liquidation. Fruehauf contends that since the Plan under the prior case was substantially consummated and then failed, the only alternative is liquidation of the prior case under Chapter 7. Fruehauf points to § 1112(b) to support its argument.

■ Aside from the alleged procedural defects in Fruehauf's suggestion,[9] Fruehauf overlooks the discretionary nature of § 1112(b). By no means does § 1112(b) require a court to convert a case when the post-confirmation entity is unable to fulfill the obligations contained in a confirmed plan. Rather, this Court may convert or dismiss such a case for cause if it is in the best interest of the creditors and the estate.[10] The Court must balance equities and consider the interests of creditors and the estate in determining whether conversion is appropriate. *In re Macon Prestressed Concrete Co.*, 61 B.R. 432, 436 (Bankr.M.D.Ga.1986). *See also In re Baumgartner*, 57 B.R. 513 (Bankr.N.D. Ohio 1986); *In re The Ledges Apartments*, 58 B.R. 84 (Bankr.D.Vt.1986): *In re Sheehan*, 58 B.R. 296 (Bankr.D.S.D.1986). (What constitutes "cause" for dismissal is a matter of judicial discretion.) *See also In re Koerner*, 800 F.2d 1358, 1368 (5th Cir. 1986). (The Court is not required to give exhaustive reasons for its decision whether or not to convert a case.) The Court has wide discretion in determining whether or not to convert a case. S.Rep. 989, 95th Cong. 2nd Sess. 117 (1978) *reprinted in* U.S.Code Cong. and Admin.News, 5787, 5903 (1978).

■ The conversion of Jartran I would raise a myriad of administrative problems that are mind-boggling. Over six years have elapsed since the original Jartran I

---

7. The reasoning of both *AT of Main* and *Northampton* suggest that the prohibition on serial Chapter 11 filings is to prevent debtors from abusing the court's protection to modify contracts from previously confirmed plans "by filing chapter 11 petition *ad infinitum*". *In re Northampton*, 37 B.R. at 112–13: *see also AT of Maine*, 56 B.R. at 57. No such possibility of abuse exists in the instant case since the debtor has not asked for this Court's protection to modify the Master Leases or other agreement.

8. Fruehauf argues that it is entitled to priority under § 365(g)(2)(A), which allows priority to a claimant who is a party to a contract that has been assumed and subsequently rejected in the same case. Since this Court has determined that the instant case is a different case than the prior case, § 365(g)(2)(A) is inapplicable. *But see In re Multech*, 47 B.R. 747 (Bankr.N.D.Iowa 1985). For the same reasons, Fruehauf is not entitled to priority for its claim resulting from the breach of the October 24, 1985 agreement.

9. See fn. 4, *supra*. This alleged defect has no substantiative barring on the Court's decision.

10. The issue of whether this Court retains jurisdiction over Jartran to enter an order converting it to a Chapter 7 liquidation under § 1112(b) is raised in Jartran II's Reply, P. 941. The Court need not address this issue as it has determined not to convert Jartran I.

and almost one and a half years since the Plan was confirmed. Under § 348, conversion of a case from Chapter 11 to Chapter 7 relates back to the date of the original filing. *In re Williamson*, 804 F.2d 1355 (5th Cir.1986). *In re Langholf*, 37 B.R. 414 (Bankr.N.D.Ill.1984); R. Ginsberg, *Bankruptcy* ¶ 12, 702 (1985). The relation back raises many issues including what assets are includable in the estate. *Cf.* Epstein, *Consequences of Converting a Bankruptcy Case*, 60 Am.Bank.L.J. 339, 353–54 (1986).

As Judge Robert D. Martin reasoned in *In re Ford*, 61 B.R. 913 (Bankr.W.D.Wis. 1986), conversion of a case from Chapter 11 to Chapter 7 leads to a potentially anomalous situation where property acquired by a Chapter 11 estate after commencement of the case could revert to the debtor upon conversion, while post-petition, pre-conversion debts are treated as if they arose prior to the original Chapter 11 filing. *Id.* at 917.[11]

On conversion of Jartran I, to a Chapter 7 liquidation one of the questions which would arise is which, if any, of the pre-conversion claims against Jartran Inc., Jartran I, Jartran and now Jartran II would be granted administrative priority. Administrative claims survive dismissal. Section 348(d) provides:

(d) A claim against the estate or the debtor that arises after the order for relief but before conversion in a case that is converted under section 1112, 1307, or 1208 of this title, other than a claim specified in section 503(b) of this title, shall be treated for all purposes as if such claim had arisen immediately before the date of the filing of the petition.

Section 503(b)(1)(A) allows priority treatment for claims for the "actual, necessary cost of preserving the estate".

Conversion of Jartran I would create a Chapter 7 estate as of December 31, 1981 (§ 348(a)). The trustee of the Chapter 7 estate would have the powers provided under § 549(a) to "avoid a transfer of property of the estate ... that occurs after the commencement of the case [December 31, 1981]; and that is not authorized under [the Bankruptcy Code] or by the court" (§ 549(a)).[12] However, subsection (d) of § 549 limits the powers of the trustee to avoid such transfers to a period two years after the date of the transfer sought to be avoided.[13]

Upon the conversion of the Jartran I case to Chapter 7 parties who transacted business with an entity who was operating under a confirmed plan of reorganization free of Bankruptcy Court supervision could find their transactions might well be subject to the avoidance powers of § 549 and their claims limited by § 348(d).

Jartran I's trustee's avoidance powers under the preference provisions of § 547 and the fraudulent conveyance provision of § 548 would be ineffective as respects the operations of Jartran under the Plan as those provisions of the law look retrospectively at a debtor's dealing commencing with the date of filing (December 31, 1981).

**11.** Though not applicable in all parts to a conversion of Chapter 11 to a Chapter 7, cases dealing with the conversion of a Chapter 13 to a Chapter 7 shed light on the problems to be encountered. Some courts have held that wages and property acquired by a Chapter 13 debtor during the Chapter 13 estate, but prior to conversion to Chapter 7 are not part of the converted estate. *See, e.g., In re Bullock*, 41 B.R. 637 (Bankr.E.D.Pa.1984): *In re Hannan*, 24 B.R. 691 (Bankr.E.D.N.Y.1982); *But see In re Wanderlich*, 36 B.R. 710 (Bankr.W.D.N.Y.1984) (Wages are part of the estate upon conversion from Chapter 13 to Chapter 7. Conversions from Chapter 11 to Chapter 7 differ because post-petition, pre-confirmation property of the estate is usually generated from existing property of the estate and would therefore be included in the estate

under § 541(a)(7).) However, if new capital is advanced or new loans incurred to purchase additional property would such property become property of the estate? Who would be a claimant to this property on its liquidation?

**12.** Section 549 was derived from sections 70d and 63b of the Bankruptcy Act and was intended to protect a bona fide post petition transferees. *See generally* 4 King, *Collier on Bankruptcy* ¶ 549.01 (1986).

**13.** Are not the trustee's § 549 avoidance powers further limited to violations of the confirmation order and the plan since upon confirmation the debtor is free of the court and the Code except as provided in the order and plan?

(The trustee will of course have the avoidance powers granted under § 544.)

This Court is of the opinion that both § 348(d) and § 549 were not designed, nor intended, to apply to an entity such as Jartran which had operated under a confirmed, non-amendable plan of reorganization.[14]

Resolving the foregoing and other administrative problems which could arise upon a conversion of an entity operating for several years under a confirmed plan of reorganization would consume enormous resources that could and should be otherwise distributed to creditors.

An orderly liquidation within the Jartran II proceedings would be more in keeping with the purposes of the Bankruptcy Code than a conversion of Jartran I.

Therefore, Fruehauf's motion to dismiss the instant case pursuant § 1112(b) will be denied.

■ Finally, Fruehauf has asked for administrative priority for costs it estimates to be $1,500,000 incurred in marshalling and repossessing leased equipment. Fruehauf claims that these expenses have been incurred since the filing of the instant case and repossessing its equipment was necessary to minimize this estate's expense in that regard. As was stated in *In re Patch Graphics*, 58 B.R. 743 (Bankr.W.D.Wis. 1986), prior to allowing an administrative expense, the Court must determine that the expenditure was "actual and necessary" and the expense must benefit the estate as a whole, rather than the specific claimant. *Id.* at 745. *See also In re McK, Ltd.*, 14 B.R. 518, 520 (Bankr.D.Colo.1981) ("When a creditor incurs expenses primarily to protect his own interest the creditor is not entitled to a priority administrative claim."); *In re O.P.M. Leasing Services, Inc.*, 23 B.R. 104, 121 (Bankr.S.D.N.Y. 1982).

As an undersecured creditor, Fruehauf is clearly acting in its own best interest by marshalling and repossessing equipment which it owns. Fruehauf's actions do not benefit the estate as a whole, therefore, its claim for administrative priority must be denied.

NOW THEREFORE IT IS ORDERED that Fruehauf's motion for administrative priority for its three claims, (i) breach of contract under the Master Leases; (ii) breach of the October 24, 1985 Agreement; and (iii) costs incurred in marshalling the leased property hereby are denied.

IT IS FURTHER ORDERED that Fruehauf's motion to dismiss the instant case is denied.

IT IS FURTHER ORDERED that the parties motions for summary judgment are dismissed as moot.

IT IS FURTHER ORDERED that counsel for the Debtor serve a copy of this Order on all parties of record within five (5) days of its receipt.

---

**14.** The Court notes that the remedial provisions of the Code, §§ 547 and 548 regarding preferences and fraudulent conveyances, do not apply as to transactions that occur while an entity has been operating under a confirmed plan of reorganization if that entity then converts the case to a case under Chapter 7. In those situations the trustee would have only state created powers to avoid fraudulent transfers and preferences. Congress apparently never anticipated the conversion to Chapter 7 of a reorganized debtor after substantial operations under a confirmed plan. Though a plan might specifically provide for a conversion upon the failure to complete the plan, (for example in order to preserve preference claims, *see e.g., In re Iberis International, Inc.*, 72 B.R. 624 (Bankr.W.D. Wisc.1986) (C.J. Martin)), the aforementioned problems remain. The trustee of a converted estate should have the same powers of a trustee appointed to a newly created estate, to adequately perform the obligations imposed upon such a trustee and protect all creditors of the estate. In addition, property of the estate under § 541 should include that which the debtor has as of the date of conversion. *Cf. In re Ford*, 61 B.R. 913 (Bankr.W.D.Wisc.1986). Under current law the only way a trustee can possess such powers is by way of the commencement of a new case.